OPINION
{¶ 1} Appellant, Todd M. Eggleston, appeals from the judgment of conviction entered by the Lake County Court of Common Pleas after a trial by jury. Appellant challenges the sufficiency and the weight of the evidence upon which the jury based its verdict. For the reasons set forth in this opinion, we affirm.
 {¶ 2} Appellant and Rose Palumbo began dating in March of 2007. They had a somewhat tumultuous relationship, breaking up in June, 2007 and getting back together *Page 2 
in August, 2007. On September 30, 2007, Palumbo, her two young daughters, and appellant went on a picnic at a local park. The couple's friends, Nikki and Bob Woodin, also attended with their children. After the picnic, the children were taken back to the Woodin residence, while the four adults went to a local bar, the Lake Dine and Dance. After a few drinks, the group went to a second bar located near the Woodin's home, Katie's Pub, to continue their evening out.
 {¶ 3} While at Katie's Pub, appellant and Palumbo had a verbal disagreement about the driving arrangements that evening. The argument ended with Palumbo breaking up with appellant and leaving the bar. Palumbo walked to the Woodin's residence, reclaimed her daughters, and started to leave for home. Appellant came upon Palumbo's vehicle and indicated he wanted to go with Palumbo. Palumbo declined and, as she drove off, appellant fell to the ground. Evidently appellant's hand was caught by the car door handle. Recognizing appellant had fallen, Palumbo backed up to check on him. According to Palumbo, appellant arose from the pavement with his fists clenched and yelled, "[y]ou f***king bitch. I am going to kill you. You gave me road rash." In light of this threat, Palumbo drove away. Appellant returned to the bar where he stayed until 2:30 a.m. He eventually spent the night with friends who lived behind the bar.
 {¶ 4} Palumbo subsequently made arrangements for her estranged husband, Robert Palumbo, to stay at her home that night. Mr. Palumbo agreed but left for work at approximately 5:00 a.m. the next morning. Meanwhile, appellant awoke and walked over to the Woodin residence where he learned Palumbo had invited her husband to stay with her the previous night. Appellant asked the Woodins if they could drive him to *Page 3 
Palumbo's home. Neither of them could accommodate appellant so he borrowed a bicycle and peddled to Palumbo's residence on his own.
 {¶ 5} Upon his arrival, between 8:30 a.m. and 8:45 a.m., appellant began knocking on the house's locked back door. Palumbo's eldest daughter woke Palumbo and advised her appellant was at the door. Palumbo told her not to open the door and to remain in the bedroom. The older daughter collected the younger daughter and returned to Palumbo's bedroom. After being denied entry, appellant began aggressively banging on the door. Appellant eventually kicked in the door which prompted Palumbo to pick up her telephone. However, as she dialed 9-1-1, appellant immediately pulled the phone cord from the wall.
 {¶ 6} According to Palumbo, appellant charged toward her with his fists clenched and punched her in the side of the head. He told her she need not bother calling for help because he "took care of that." Palumbo then retreated to the bedroom where her daughters were located. As the young girls attempted to leave the room, appellant announced "[n]obody is going anywhere." Palumbo asked appellant to allow the girls to leave but appellant advised her to "shut up" and told her nobody was leaving the room to get help. According to Palumbo, appellant proceeded to punch her in the face and head repeatedly. When the flurry stopped, Palumbo again asked appellant if her children could leave the room. Appellant responded that they could not leave because he wanted them to watch what he was about to do to her. Appellant then pulled Palumbo by her hair and punch her in the face again.
 {¶ 7} During the assault, appellant informed the children that he was trying to make up his mind as to whether he should let Palumbo live or die. According to *Page 4 
Palumbo, appellant then remarked that "`[i]t [did not] look like a good day for [Palumbo] being alive'" and further observed "`I know I'm going back to prison for what I am doing. So I am just going to kill you and make it worth my while.'" When Palumbo's five-year old daughter personally asked if she could leave the room, appellant stated he was "going to kill [her] mommy and [she was] going to watch." Throughout the episode, appellant regularly blocked the doorway to the bedroom.
 {¶ 8} Approximately four and one-half minutes after Palumbo's 9-1-1 call was disconnected, the police arrived at the home. Appellant quickly left the bedroom and ran out the ruined backdoor. Appellant jumped a fence behind the house and eluded the police on foot. He was later located and taken into custody.
 {¶ 9} Appellant was ultimately indicted on one count of aggravated burglary, in violation of R.C. 2911.11(A)(1), a felony of the first degree; one count of disrupting public services, in violation of R.C. 2909.04(A)(1), a felony of the fourth degree; three counts of kidnapping, in violation of R.C. 2905.01(A)(3), felonies of the first degree; three counts of kidnapping, in violation of R.C. 2905.01(A)(2), felonies of the first degree; one count of attempted murder, in violation of R.C. 2923.02, a felony of the first degree; and one count of felonious assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree. After waiving his right to be present at his arraignment, the trial court entered pleas of "not guilty" to all charges on appellant's behalf.
 {¶ 10} Prior to trial, the state moved to dismiss the attempted murder count, which was granted. The matter proceeded to trial, after which the jury found appellant guilty of aggravated burglary, disrupting public services, three counts of kidnapping, in violation of R.C. 2905.01(A)(3), and misdemeanor assault, a lesser included offense of *Page 5 
felonious assault. Appellant was acquitted of the three counts of kidnapping charged pursuant to R.C. 2905.01(A)(2). Appellant was later sentenced to 4 years imprisonment for the aggravated burglary conviction; 1 year imprisonment on the disrupting public services conviction; 5 years imprisonment on the kidnapping conviction related to Palumbo; 6 years on each kidnapping conviction related to Palumbo's daughters; and 6 months on the assault conviction. The terms for aggravated burglary, disrupting public services, and assault were ordered to run concurrently to each other and consecutive to the terms for kidnapping, each of which were to run concurrently to each other. In total, appellant was sentenced to serve an aggregate term of 10 years in prison.
 {¶ 11} Appellant now appeals and asserts two assignments of error.
 {¶ 12} Appellant's first assignment of error provides:
 {¶ 13} "The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal made pursuant to Crim. R. 29(A)."
 {¶ 14} Crim. R. 29 states, in pertinent part:
 {¶ 15} "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."
 {¶ 16} When reviewing whether the evidence is sufficient to support a criminal conviction, an appellate court examines the evidence and determines whether it, if believed, would convince the average mind of a defendant's guilt beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, 273. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational *Page 6 
finder of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id.
 {¶ 17} Under his first assignment of error, appellant initially contends the prosecution failed to put forth adequate evidence to support the aggravated burglary charge. Specifically, appellant contends the state failed to prove, beyond a reasonable doubt, he was trespassing in the structure at issue with the purpose of committing a criminal offense.
 {¶ 18} R.C. 2911.11, the code section defining the crime of aggravated burglary, provides in pertinent part:
 {¶ 19} "(A) No person, by force * * * shall trespass in an occupied structure * * * when another person * * * is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
 {¶ 20} "(1) The offender inflicts * * * physical harm on another;"
 {¶ 21} R.C. 2911.21 (A)(1) defines trespassing as the act of knowingly entering or remaining on the land or premises of another without privilege to do so. Appellant contends there was insufficient evidence to support his conviction for aggravated burglary because he was not trespassing in the structure at the time of the incident. Rather, appellant maintains the evidence submitted at trial demonstrated he was living with the victim in the home as a permanent resident. We disagree.
 {¶ 22} Although there was evidence that appellant kept certain belongings at the home (e.g., clothes in duffle bags, weights, guitars, toiletries) and often spent the night, there was ample evidence specifically indicating he was not a permanent resident of the home. The victim testified she and her two daughters were the sole residents of the *Page 7 
home. She stated her name appeared on the lease and, even though appellant might have stayed at the home approximately 20 days a month, she never invited him to live at the home. This testimony was echoed by the victim's eldest daughter, Olivia Pike, who testified appellant stayed at the home "on and off." However, she stated she, her mother, and her sister were the only individuals living in the home. This evidence was sufficient to demonstrate appellant was not a resident of the home, but a trespasser for purposes of the aggravated burglary statute.
 {¶ 23} Appellant next argues that even if the state's evidence sufficed to demonstrate he was a trespasser, it was insufficient to prove he did so with the purpose to commit a crime. Rather, appellant contends he broke down the door with the innocuous purposes of talking with Palumbo and/or "collect[ing] his things and mov[ing] out." Although appellant's contentions may bear upon an analysis of the evidential weight, they do not negate the evidence put forth by the state indicating appellant trespassed in the structure with the purpose of assaulting Palumbo.
 {¶ 24} The state presented evidence that appellant kicked in Palumbo's door in a state of heightened rage. Palumbo testified, once he gained entry, appellant came at her with his "fists * * * clenched, he was yelling and his face was very tight, very angry." Appellant "instantly punched [her] on the left side of [her] face." Appellant advised Palumbo that she need not bother calling for help because he "already took care of that. Nobody's coming to help * * *." Palumbo fled to her bedroom where appellant grabbed Palumbo's hair and began punching her in the face repeatedly. After this barrage, appellant paused and announced that he knew he was going back to prison for his *Page 8 
actions so he was "just going to kill [Palumbo] and make it worth [his] while." Appellant continued to punch Palumbo in the head until the police arrived.
 {¶ 25} To act with purpose is to act with a conscious objective of engaging in particular conduct or producing a particular consequence.State v. Johnson, 11th Dist. No. 2006-L-259, 2007-Ohio-259, at ¶ 39. The purpose with which an individual acts may be gleaned from his or her conduct or the manner in which an action is accomplished. Id. When viewed in a light most favorable to the prosecution, the evidence of appellant's conduct on the day of the incident, in conjunction with the evidence that, on the previous night, appellant had threatened to kill Palumbo, was sufficient for the jury to draw the reasonable conclusion that appellant forcibly trespassed in Palumbo's home with the purpose to assault her.
 {¶ 26} Appellant next argues the trial court failed to prove beyond a reasonable doubt the kidnapping charges. Appellant contends there was insufficient evidence to permit the jury to conclude he restrained the victims of their liberty by force or threat of force with the purpose to facilitate the commission of a felony or terrorize or inflict serious physical harm.
 {¶ 27} Appellant was convicted on three counts of kidnapping in violation of R.C. 2905.01(A)(3), which provides:
 {¶ 28} "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 29} "* * * *Page 9 
 {¶ 30} "(3) To terrorize, or inflict serious physical harm on the victim or another;"[1]
 {¶ 31} Palumbo testified that her daughters went in her bedroom after appellant broke in the home. After being struck, Palumbo retreated to the bedroom and appellant followed. Once Palumbo and appellant entered the room, Palumbo's daughters attempted to leave; however, appellant stated "[n]obody is going anywhere" and blocked the doorway. Palumbo entreated appellant to allow the girls to leave but he reiterated that "they weren't going anywhere because nobody was going to have the chance to call for help." Appellant proceeded to beat Palumbo in front of her children all the while blocking the path to the doorway. Throughout the episode, the girls were screaming and begging appellant to leave. Appellant advised them he did not intend to leave and, moreover, he was going to kill their mother and they were going to watch.
 {¶ 32} The state put forth adequate evidence to demonstrate appellant restrained Palumbo and her two daughters by deliberately blocking their means of egress. Moreover, appellant's actions and remarks indicate he did so with the purpose of terrorizing the young girls and inflicting serious physical harm on Palumbo. Appellant's convictions for kidnapping are therefore supported by sufficient evidence.
 {¶ 33} Appellant's first assignment of error is overruled.
 {¶ 34} Appellant's second assignment of error alleges:
 {¶ 35} "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict against the manifest weight of the evidence." (sic.) *Page 10 
 {¶ 36} When reviewing a challenge to a criminal conviction based upon the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers witness credibility and determines whether, in resolving evidential conflicts, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Hale, 11th Dist. No. 2003-P-0075,2004-Ohio-6943, at ¶ 11.
 {¶ 37} When considering the weight of the evidence, an appellate court "sits as a `thirteenth juror'" and may "disagree[] with the factfinder's resolution of the conflicting testimony." State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52. However, the award of a new trial based upon the weight of the evidence must be reserved for those extraordinary cases where the evidence preponderates heavily against the jury's verdict, i.e., where, "`on the evidence and theories presented, * * *no reasonable jury could have found the defendant guilty.'" (Emphasis sic.) State v. Higgins, 11th Dist. No. 2005-L-215, 2006-Ohio-5372, at ¶ 37, quoting State v. Bradford (Nov. 7, 1988), 5th Dist. No. CA-7522, 1988 Ohio App. LEXIS 4576, *4. Hence, upon undertaking a manifest weight analysis, a reviewing court stands as thirteenth juror only insofar as it is necessary to prevent an injustice when the evidence simply does not support the jury's verdict. Absent such a situation, the twelve-member panel retains its role as the final arbiter of the facts placed in evidence.
 {¶ 38} Appellant's first argument under his second assignment of error challenges his aggravated burglary conviction. In appellant's view, the evidence demonstrates he was permanently residing in the home where the incident took place. *Page 11 
As a result, he may not be legally held a trespasser and thus his conviction for aggravated burglary is invalid.
 {¶ 39} Appellant draws this court's attention to certain facts which might lead the factfinder to the conclusion that appellant was a functional resident of the home irrespective of Palumbo's and her daughter's testimony to the contrary. Appellant points out he kept personal belongings, such as clothes, weights, and toiletries at the home. He further notes he contributed to household maintenance and assisted with payment of certain expenses. Although Palumbo conclusively testified appellant was not a permanent resident of the home, appellant asserts her position was "clearly motivated by the hatred she now feels towards [him] and the fact that she would lose her government assistance by admitting he lived with her * * *."
 {¶ 40} Initially, appellant's points relating the factors which motivated Palumbo's testimony are merely subjective speculations which have no necessary impact on the state's evidence. Further, and more importantly, regardless of the evidence that might lead to an inference supporting appellant's functional habitation, the competing testimonial evidence discussed above indicated appellant was merely a guest. The jury was free to believe the state's witnesses on this issue and we cannot say it was unreasonable in doing so.
 {¶ 41} Moreover, regardless of how frequently appellant stayed at Palumbo's residence, Palumbo testified she locked the door and verbally forbade her daughter from allowing appellant to enter the home on the day of the incident. Such evidence demonstrates appellant was not privileged to enter the home. However, assuming arguendo, even if appellant was somehow privileged to forcibly enter the home, this *Page 12 
court has held that one's privilege to remain on another's premises terminates the moment he commits an assault on the victim.Johnson, supra, at ¶ 33, citing State v. Steffen (1987),31 Ohio St.3d 111. In Johnson, the defendant was a guest in the victim's apartment. After an altercation with the victim, the defendant left the apartment. He later returned but was denied entry. After successfully kicking in the door, the defendant stabbed the victim four times. FollowingSteffen, this court determined:
 {¶ 42} "Evidence of an assault gives rise to an inference that the actor is no longer privileged to remain on the victim's property and that he knew the privilege had been terminated." Id. at ¶ 33.
 {¶ 43} Accordingly, it is reasonable to infer any privilege appellant may have had to be on the premises ceased once he commenced his assault on Palumbo. As the Supreme Court observed in Steffan, "* * * the inference is so strong that it excludes the possibility of drawing from the same facts any other reasonable inference supporting a theory of innocence." Id. at 115.
 {¶ 44} Notwithstanding the evidence that appellant kept certain personal items at the home, the jury did not lose its way in concluding appellant was neither a permanent resident in the home, nor privileged to forcibly enter the same. Further, pursuant to Johnson andSteffan, even if appellant was somehow privileged to forcibly enter and remain on the premises, his act of beating Palumbo after gaining entry was sufficient to revoke any possible privilege he may have originally possessed.
 {¶ 45} Appellant's next argument challenges the weight of the evidence relating to his purpose for breaking down Palumbo's door. Appellant specifically argues his true purpose for forcibly entering the structure was to collect his belongings, not to assault *Page 13 
Palumbo. Appellant claims he felt it necessary to break into the home because he believed Palumbo was asleep from drinking too much the night before. He only assaulted her after discovering Palumbo's estranged husband spent the night at the home. Because he became violentafter this discovery, he argues the jury lost its way in concluding he entered for the purpose of assaulting Palumbo.
 {¶ 46} Despite appellant's purportedly benign purpose for gaining entry into the home, Palumbo's and her daughter's testimony reveals he became violent immediately after breaking in the door. Neither witness testified appellant became suddenly violent after finding out Palumbo's estranged husband had spent the night at the home. Moreover, appellant rode a bicycle to Palumbo's home on the morning of the crimes. In light of appellant's asserted purpose, it is unclear how appellant intended to retrieve and remove his clothes, toiletries, and weights given his limited means of transportation.
 {¶ 47} To be sure, appellant's version of the events, including his purpose for entering, were different than the evidence submitted by the state. However, when conflicting testimony is offered at trial, a conviction is not against the weight of the evidence simply because the jury chose to believe the prosecution's evidence. State v. Beesler, 11th Dist. No. 2002-A-011, 2003-Ohio-2814, at ¶ 22. Appellant's conviction for aggravated burglary was not against the weight of the evidence.
 {¶ 48} Finally, with respect to his convictions for kidnapping, appellant argues the evidence demonstrated Palumbo and her daughters were already in Palumbo's bedroom when he entered the home. He therefore claims he did not force any of the victim's into that room. Appellant further claims he did not block Palumbo's daughters *Page 14 
from exiting the room; rather, he asserts the door to the room was open at all times and thus they remained in the room voluntarily.
 {¶ 49} Again, the state presented evidence that contradicts appellant's construction of events. Palumbo testified appellant, immediately after kicking in the door, came towards her angrily with his fists clenched, punched her in the face, and explained she need not bother calling for help as he had ripped the cord from the wall. After being struck, Palumbo testified she retreated to her bedroom where her daughters had been. Also, Palumbo's daughter Olivia testified that her mother entered the room after appellant had gained entry into the house. With respect to whether appellant forcibly restrained the liberty of Palumbo's daughters by compelling them to remain in the bedroom throughout the assault, Palumbo testified appellant blocked the path to the door and repeatedly indicated that no one would leave. There was also evidence that appellant specifically told the young girls they could not leave the room because he wanted them to watch him beat their mother.
 {¶ 50} It is well-established that the weight to be given to evidence and the credibility of witnesses are determinations to be made by the jury. Hale, supra, at ¶ 17; see, also, State v. Babbitt (Sept. 30, 1999), 11th Dist. No. 98-A-0109, 1999 Ohio App. LEXIS 4638, *9-*10. The jury was free to believe the testimony of the state's witnesses and disregard appellant's self-serving testimony regarding his purpose for entering as well as his version of the events. State v. McLean, 11th Dist. Nos. 2003-T-0117 and 2003-T-0018, 2005-Ohio-1562, at ¶ 2. In this matter, it is apparent that the jury found the state's evidence more credible than that of the defense. As the jury's conclusion *Page 15 
does not amount to a fundamental miscarriage of justice, we hold appellant's kidnapping convictions were not against the manifest weight of the evidence.
 {¶ 51} Appellant's second assignment of error is therefore overruled.
 {¶ 52} For the reasons discussed in this opinion, appellant's two assignments of error are without merit and the judgment entry of the Lake County Court of Common Pleas is hereby affirmed.
MARY JANE TRAPP, J., and TIMOTHY P. CANNON, J., concur.
[1] "Terrorize," for purposes of this subsection of the kidnapping statute, has been defined according to its common usage, i.e., "`to fill with terror or anxiety.'" State v. Leasure, 6th Dist. No. L-02-1207, 2003-Ohio-3987, at ¶ 47, quoating Merriam Webster's Collegiate Dictionary (10th Ed. 1996), 1217; see, also, State v. Canter, 10th Dist. No. 01AP-531, 2002-Ohio-1347. *Page 1